**John H. CROMLING, Appellant,**

v.

**The PITTSBURGH AND LAKE ERIE R.R. CO.**

**No. 14360.**

United States Court of Appeals
Third Circuit.

Argued June 17, 1963.

Decided Nov. 13, 1963.

Rehearing Denied Feb. 5, 1964.

Daniel M. Berger, Pittsburgh, Pa. (Morris M. Berger, Berger & Berger, Pittsburgh, Pa., on the brief), for appellant.

Gordon E. Neuenschwander, Pittsburgh, Pa., for appellee.

Before BIGGS, Chief Judge, and STALEY and FORMAN, Circuit Judges.

BIGGS, Chief Judge.

John Cromling brought this suit under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., against his employer, The Pittsburgh and Lake Erie Railroad Company (the "Railroad" or the "Pittsburgh Railroad") to recover damages for injuries sustained in the course of his employment. The jury rendered a verdict in Cromling's favor in the sum of $18,000. It is Cromling's contention that the award was inadequate and that this was caused by the prejudicial actions of the trial court. This appeal is from an order of the court

**144**

below denying Cromling's motion for a new trial.[1]

From the evidence the jury could have found that on January 7, 1960, while riding on the side of a box car in the course of his employment as brakeman for the Pittsburgh Railroad, Cromling was struck by a protruding gondola car on an adjoining track. He did not require a leave of absence at that time and continued to work until a pain in his back forced him from duty on December 2, 1960. He was still not working at the time the trial commenced in the court below on October 4, 1962.

The Railroad did not concede negligence, but the central issue at the trial was the nature and extent of the back injuries suffered by Cromling in the accident. Cromling submitted evidence that he was permanently disabled as a result of the accident. The Railroad attempted to show that Cromling's present condition was not wholly attributable to the accident but had an earlier origin.

Cromling has asserted three grounds why the judgment should be reversed and a new trial granted. Two grounds relate generally to efforts of the Pittsburgh Railroad to prove prior disability. The first of these concerns the admissibility of a letter. Before passing on this con-tention, certain uncontroverted background facts must be set out.

The Pittsburgh Railroad is a component part of the New York Central System ("Central"). Under the rules of Central, the Pittsburgh Railroad has authority to grant an employee an initial leave of absence up to ninety days. The power to extend original leaves is vested exclusively in Central, and if an extension is to be granted, Central requires a doctor's certificate detailing the nature of the injury to the individual involved. Central does not deal directly with the Pittsburgh Railroad's employee in regard to an extension. Instead, the Pittsburgh Railroad transmits to Central both the doctor's certificate and the extension request.

At the trial the Pittsburgh Railroad called as a witness Central's Director of Employee Benefits. Testifying with reference to Central's records which he had before him, this witness stated that Cromling was granted a leave of absence on August 7, 1943 because of a back injury and that the leave was extended twice for ninety day periods, to November 7, 1943 and again to February 7, 1944. The significance of the testimony set out below [2] for present purposes is that at some time in the period indicated, the

1. Technically, an order denying a new trial is not appealable (except in extraordinary circumstances not present here), the dispositive action of the court below being embodied in the final judgment. If, however, an appeal like this at bar is timely taken in regard to the final judgment, the general rule is to treat an appeal from the order denying a new trial as harmless error and to dispose of the appeal as if it had been taken from the final judgment. 6 Moore, Federal Practice, 2d ed. 1953, par. 59.15 [1]; cf. United States v. Certain Land in the City of Paterson, 322 F.2d 866 (3 Cir. 1963). We, therefore, will treat the present appeal as if taken from the final judgment.

2. His testimony on this point was as follows:

"The Witness: Under our rules * * * when an individual applies for leave of absence, the employing officer may grant the first 90 days. If any extension beyond that time is necessary, we approve a Form DP 51, Leave of Absence form, but we require a certificate from the doctor detailing the illness or injury, as the case may be, of the individual involved.

"The Court: Well, does your record show a leave of absence for the plaintiff here in this case?

"The Witness: It does, yes, sir.

"The Court: When is the leave of absence?

"Mr. Neuenschwander [counsel for the Pittsburgh Railroad]: Refer to your record, Mr. Rose.

"The Witness: It shows a number of leaves of absence. This particular one was August 7, 1943, leave of absence, condition of back, extended to November 7, 1943 and to February 7, 1944, and it shows the individual returned to service February 1, 1944.

"The Court: It shows the leave commenced when?

"The Witness: August 7, 1943.

"By Mr. Neuenschwander:

"Q And when was it extended, sir?"

exact date not being shown by the record, a physician's certificate became necessary under Central's rules to support Cromling's further abstention from work.[3]

Earlier in the proceedings, during cross-examination of Cromling by Pittsburgh Railroad's counsel, the following exchange had taken place.

"Q And back in August of '43, you entered Mercy Hospital under the care of Dr. Kuehner for a back condition.

"A No.

"Q No?

"A Not for a back condition. Maybe for piles or something.

"Q And the time that you were taken off duty from August 7, 1943 to February of '44, you say that was for a back condition or not for a back condition?

"A Not."

\* \* \*

"Q Mr. Cromling, I think we left this open: What was the reason that you were confined to Mercy Hospital back in 1943?

"A I don't know.

"Q Do you know if you were confined or not?

"A No, sir.

"Q What was your answer?

"A No, sir.

"Q Well, were you ever under the care of a Dr. Kuehner?

"A Yes, sir.

"Q And what was Dr. Kuehner treating you for?

"A Why, osteomellitis of the sternum coming from a broken jaw.

"Q Have you ever been under the care of Dr. Kuehner on more than one occasion?

"A Well, I had an irritated bowel one time that he took care of that I know of.

"Q Well, did he ever treat you in any way because of a back condition?

"A Not that I know of."

With these operative facts in mind, we turn to the issue presented. Cromling contends that the court below erred in admitting in evidence, over an objection as hearsay, a letter apparently dictated by Dr. Kuehner and signed by his secretary. The letter was identified by Central's Director of Employee Benefits as coming from Central's file on Cromling. No evidence was presented as to the mode of preparation of the letter.

"A It was extended to November 7, 1943, and again to February 7th, 1944, each for a period of 90 days.

"Q Each period was more than 90 days?

"A Each extension was 90 days. The employing officer granted the first 90 days and we approved an extension of 90 days twice.

"Q Who is responsible for obtaining the doctor's certificate?

"A Our office.

"Q Well, who initiates the request for the doctor's certificate under your system?

"A Well, if the employing officer does not send it in with the extension of leave of absence request, we will then write him and ask him to furnish it as required by our rules.

"Q Do your records show which was done in this particular case?

"A We don't have all the details, but we have the sheet giving a synopsis and it shows the leave of absence originally granted August 7, 1943 on account of condition of back.

"The Court: Well, who made that request?

"The Witness: The employing officer.

"The Court: Who made the request for the leave of absence? That is what I am talking about.

"The Witness: The employing officer. The individual makes it to his boss and then it comes through channels to our office, and in this case it was Mr. C. M. Yoy, who at that time I believe was vice president of the Pittsburgh & Lake Erie."

3. The testimony is unclear because its fails to distinguish between or identify the date of the original leave granted by the Pittsburgh Railroad and the extensions by Central. See note 2, supra.

Neither was it shown that Dr. Kuehner was unable to testify. The court admitted the letter on the basis of the Federal Business Records Act, 28 U.S.C. § 1732 (a) set out hereinafter, conceiving that "the matter is so primary that it needs no citation to support it \* \* \*." [4]

The letter was described and read into evidence by Central's Director of Employee Benefits as follows: "It is on Dr. Kuehner's letterhead, dated October 12th, 1943, addressed to whom it may concern. 'This is to certify that Mr. John H. Cromling has been totally disabled and under my care since August 7, 1943. Because of the condition of his back, the date of his return to work is, as yet, indefinite. Respectfully, signed, Harold G. Kuehner, M. D.' It shows dictated by HGK—"

The letter was pertinent in two aspects. It served to impeach Cromling's earlier testimony that he had not been under Dr. Kuehner's care in 1943 for a back condition. It also served as positive evidence that Cromling had experienced a disabling back condition as far back as 1943.[5]

The letter is prima facie hearsay. It is relevant only if offered for the truth of its contents.[6] The Pittsburgh Railroad supports the ruling below on the basis of the business records rule or in the alternative on the rule of evidence relating to admissions by a party.

The letter clearly does not qualify as a business record within the meaning of either the Federal Business Records Act, 28 U.S.C. § 1732(a) or the Pennsylvania Uniform Business Records as Evidence Act, 28 P.S. § 91b.[7]

The Federal Business Records Act provides in pertinent part:

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

The Pennsylvania Uniform Business Records as Evidence Act provides: "A record of an act, condition or event shall,

4. Opinion on the motion for a new trial.

5. The record discloses that, prior to admission of the letter, at proceedings at side bar, the court below seemingly indicated that the letter would be admitted only for impeachment purposes. When actually admitted later in the proceedings, however, it was during the presentation of the defendant's case and over Cromling's objection to it as hearsay and without any qualification as to use. Its admission was based on the business records rule which presupposes use as substantive evidence.

6. Technically, the letter is not hearsay when viewed solely as impeachment evidence inasmuch as for that purpose it was being used as a prior inconsistent statement of Cromling. But it cannot

be so characterized unless of course it is imputable to Cromling and this is the exact issue raised with regard to the admissions rule. As a practical matter, therefore, the letter if admissible at all is admissible for every purpose as direct evidence of the truth of its contents under the admissions rule.

7. Rule 43(a), Fed.R.Civ.Proc., 28 U.S.C., provides that all evidence shall be admitted which is admissible either under federal law or under the law of the state where the district court is held. This provision, of course, applies to actions brought under the Federal Employers' Liability Act. See and compare Masterson v. Pennsylvania R. Co., 182 F.2d 793, 796 (3 Cir. 1950).

in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

■ The decision of this court in Masterson v. Pennsylvania R. Co., 182 F. 2d 793 (3 Cir. 1950) is so squarely on point as concerns both statutes that extended discussion would be superfluous. The Pittsburgh Railroad attempts to distinguish Masterson on the ground that in that case it was the plaintiff who offered a physician's letter as evidence. But this distinction possesses no substantive significance in view of the premise and the wording of the statutes that only writings originating as business records are sufficiently trustworthy to be admissible for the truth of their contents. See Joseph v. Krull Wholesale Drug Co., 147 F.Supp. 250 (E.D.Pa.1956), aff'd per curiam, 245 F.2d 231 (3 Cir. 1957). To reiterate what was said in Masterson, the letter of Dr. Kuehner does not qualify as a business record of Central since the letter was "addressed to it." 182 F.2d at 796. Neither can it be considered as a valid business record of Dr. Kuehner inasmuch as it is not in such a form, and evidence was never presented "that the writing was actually made by or under the direction of the physician at or near the time of his examination of the individual in question and also that it was his custom in the regular course of his professional practice to make such a record." Id. 182 F.2d at 797.

The Railroad also attempts to justify the admission of the letter by means of the rule relating to admissions by a party. Admissions have been defined as the "words or acts of a party-opponent * * offered as evidence against him." McCormick, Evidence, 1954, § 239, at 502. Notwithstanding the literal hearsay nature of such statements, they are not viewed as hearsay and are customarily accepted as substantive evidence of the facts admitted. See Bruce v. McClure, 220 F.2d 330 (5 Cir. 1955). The rationale for this approach is that the purpose of the hearsay rule "is to afford a party the privilege if he desires it of requiring the declarant to be sworn and subjected to questions. That purpose does not apply, and so the hearsay rule does not apply, where the evidence offered against a party are *his* statements." United States v. United Shoe Mach. Corp., 89 F.Supp. 349, 352 (E.D.Mass.1950). (Emphasis in original.) The issue posed, therefore, is whether the letter can be validly characterized as Cromling's statement.

■■ Statements of another person are admissible as if they were the admissions of a party to a legal proceeding if, among other bases not relevant here, the court finds that the declarant was authorized by the party to make the statement, or that "the party, with knowledge of the content of the statement by words or conduct manifested his adoption or approval of the statement or his belief in its truth." Flintkote Co. v. Lysfjord, 246 F.2d 368, 383 (9 Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). An issue was present and posed in the proceeding below as to whether the letter could be validly characterized as a statement authorized or adopted by Cromling. But these possible grounds of admission were never explored or developed at the trial. The positive, albeit erroneous, ruling by the court that the letter was admissible under the Federal Business Records Act terminated the matter. What could have been developed as to these other grounds of admissibility is speculative. We, therefore, cannot reach the question of whether the letter was admissible as an authorized or adoptive admission.

The contents of the letter were an essential part of the primary defense of the Railroad. It will be remembered that Dr. Kuehner's letter as read into evidence tended to prove that Cromling was "totally disabled" due to a back condition in August of 1943 and impeached Cromling's testimony that he was not under

the care of Dr. Kuehner for a back condition at that time. The court's error in admitting the letter under the circumstances was error of a seriously prejudicial nature and may be presumed to have had a detrimental effect on the amount of damages awarded the plaintiff. On this ground alone, therefore, even if there were no other, a new trial must be ordered.

Cromling also contends that the court below erred in allowing the jury to draw an unfavorable inference from his failure to call a Dr. Gadd as a witness. At the trial evidence was presented that Cromling had entered the Monongahela Memorial Hospital on December 27, 1960,[8] twenty-five days after he had laid off work, and had been attended there by Dr. Gadd. Cromling, however, did not call Dr. Gadd to testify but relied on the testimony of two physicians attending him subsequently to support his position that he was permanently disabled as a result of the accident.[9]

The court below charged the jury on this point as follows: "When we talk about testimony, it is what the witnesses say on the stand, and I think Mr. Berger [counsel for Cromling] lays considerable stress on the general proposition of law that I want to mention; that is, the failure to call a witness, and the rule is clear, but it is like many rules of law, the interpretation is for the jury. The rule is that counsel for one party or the other has argued to you that one of the other parties has failed to call a witness—I think that he has talked about Dr. Gadd and inspectors and so on—the rule of law is that where a party litigant without explanation fails to call witnesses who are available and who have knowledge of the material facts, the inference may be drawn or can be drawn that the testimony would be unfavorable if they were called. That is a rule that the jury may apply depending on what you find the facts to be in this case. If evidence which might

properly be in the case is in the control of one party litigant or the other is not produced and he doesn't explain his failure to do so, the jury may draw an inference that it would have been unfavorable to said party. Whether or not either one of these rules should be applied depends on what you find the facts to be. Of course, when you are talking about the doctor, it applies to Dr. Gadd as well as it applies to Dr. Winters and this other one. He is in Pittsburgh. It applies to both sides. It applies to both sides even though they are not here today. There is a way in this court to take their testimony in advance and subpoena them and have them present. But it may not have any bearing on it anyway. That is all for the jury. Now, I use that by way of illustration. Of course, the jury may apply that rule of law."

No question is raised here concerning the substantive adequacy of the charge. The issue before this court is simply whether the charge should have been given in regard to Dr. Gadd. Cromling contends that an adverse inference cannot be drawn as a matter of law in the situation at bar. He attempts to support this position on two grounds. We find no merit in either contention.

Cromling's first argument is that no adverse inference can be drawn when the person in question is outside of the jurisdiction of the court. The only testimony at the trial concerning the whereabouts of Dr. Gadd came out of the cross-examination of one of Pittsburgh's witnesses, as follows:

"Q Do you know where Dr. Gadd is at the present time?

"A Yes. He is supposed to be on vacation.

"Q Do you know where?

"A It is only hearsay; he was supposed to go to Florida.

"Q We heard he was in Wisconsin. I don't know whether it is true or not.

---

8. Cromling was released from the hospital on January 4, 1961.

9. One of these physicians saw Cromling for the first time on March 11, 1961, and the other saw him first on June 20, 1961.

"The Court: That shows why we don't admit hearsay: One fellow says Florida and another Wisconsin."

█ This testimony is far from conclusive proof that Dr. Gadd was unavailable to Cromling at the time of the trial but we need not dwell on this point. The unavailability rule is not so narrow in scope as Cromling would make it. As the court below pointed out in effect in its charge, the unavailability criterion extends back to and relates to the commencement of the action rather than strictly focusing upon the time of trial. See Blumenthal v. United States, 189 F. Supp. 439 (E.D.Pa.1960), aff'd, 306 F.2d 16 (3 Cir. 1962). Indeed, no other conclusion is possible in view of the rationale of the rule for it is at the former time that the subpoena power attaches and after which depositions may be taken. Cromling offered no evidence that it was impossible to avail himself of Dr. Gadd's testimony at any time after the commencement of the suit. It follows that Cromling's first ground of objection fails.

Cromling's other ground for charging the court below with error in regard to the charge is based on the premise that Dr. Gadd's testimony would only have been cumulative of the testimony of his other medical witnesses. Cromling cites the well-settled general rule which was also encompassed in the charge of the court that no adverse inference can be drawn from the failure to call a witness whose testimony would only be cumulative of other evidence. See 2 Wigmore, Evidence, 3d ed. 1940, § 287. The reason for this general limitation upon the application of the rule is obvious. Under such circumstances there is no reason to call the witness and therefore there can be no factual basis for drawing an adverse inference.

We are willing to accept Cromling's assertion that the testimony of Dr. Gadd would have added substantially nothing to the medical theories advanced by the testifying physicians. But Cromling concedes that the testimony of Dr. Gadd may have been able to aid him in another way. Dr. Gadd attended Cromling during his confinement at Monongahela Memorial Hospital shortly after he laid off work. At that time, as is the custom in a hospital, Dr. Gadd took a case history of Cromling. This case history was admitted into evidence at the trial as part of a hospital record and certain of Cromling's statements contained therein, as interpreted and transcribed by Dr. Gadd, were damaging to the position taken by him at the trial.[10] Cromling did not concede this, but he offered no substantial rebutting testimony thereto.

█ The weight to be given to the absence of a witness is primarily one for the jury to determine by a common sense appraisal. See McCormick, supra, § 249, at 536. Conversely, the power of the court to disallow argument by counsel and to refuse a jury charge on what are essentially negative inferences should be strictly limited to those instances where the testimony is clearly cumulative. The factual situation at bar does not fall into the permissible limited category. It follows, therefore, that the court did not err in instructing the jury that it could draw an unfavorable inference from the absence of testimony by Dr. Gadd.

█ Cromling's final ground for reversal is of a different order. He complains vehemently of the conduct of the trial court with regard to various inter-

---

10. The case history reads as follows: "This 56 year old white male admitted to the hospital complaining of excruciating pain in his lower back. As long as his back remains immobilized, he has little or no pain. However, when he sits down, he is unable to get up. He is unable to turn over in bed. He walks with great difficulty and is unable to stand straight up. This pain came on suddenly approximately one week ago following a fire at his house. He does not remember any history of injury, at this time. However, he has had similar sessions with his back in the past. The review of his remaining systems is essentially negative. He was admitted to the hospital for treatment."

ruptions, interrogations of witnesses and remarks directed to his counsel. This is a very serious charge, one not to be taken lightly and one not easily sustained. Any attack on the deportment of a judge at trial must be examined very carefully and judiciously weighed by this court. We will direct our attention to remarks made by the court to Cromling's counsel during the course of the trial.

In an apparent attempt to show that the Railroad had been free of negligence in connection with Cromling's accident, the Railroad's counsel asked a number of questions of the Railroad's master mechanic in charge of train car repairs concerning the measures taken by the company with regard to car inspections. The objection of Cromling's counsel to a particular question and the court's reply follow.

"Mr. Berger [Cromling's counsel]: Now, as of what date are we talking, your Honor? We object to generalizations on this.

"The Court: I don't think that you need to object. I think that he is talking about that date. I don't think you need to jump up.

"Mr. Neuenschwander [the Railroad's counsel]: January of 1960.

"The Court: You will have a chance to talk about it. Proceed."

This same witness, testifying on the basis of inspection and repair reports of Pittsburgh not presented at trial, stated that there was no record of the repair of a car of the type which it is alleged struck Cromling at or after the time of the accident and, in effect, that such a car would have been reported and repaired if it had existed. During cross-examination of the witness on this point by Cromling's counsel, the following exchange took place.

"Q You say there is a record?

"A Yes, sir.

"Q And you never took the trouble of looking at the record yourself?

"A With my duties and that, I can not—

"Q Just answer my question, sir.

"The Court: That question is argumentative, Mr. Berger. You want to cast some aspersions by saying—

"Mr. Berger: Your Honor, I am not trying to cast aspersions.

"The Court: Well, you are a little white-faced now and you are upset over this thing. Just ask him.

"Mr. Berger: Well, I can't help for being this way, your Honor. I am trying to do the best for my client I can.

"The Court: Just don't argue with the guy; ask him questions.

"Mr. Berger: We object to the testimony because it is double hearsay. It is hearsay not only from him, but from the people who looked at it and aren't here to testify. That is my objection."

We think that the designation of Cromling's counsel's reasonable question as a possible aspersion was unnecessary and prejudicial.

At a later stage while Central's Director of Employee Benefits was on the stand testifying for the Railroad, as we have previously stated, the issue arose as to the admissibility of the letter of Dr. Kuehner. Cromling's counsel was given permission by the court to question the witness after which the following occurred:

"By Mr. Berger:

"Q Are you familiar with the signature on that paper, exhibit whatever it is? Exhibit 4 [the letter]? Are you familiar with the signature on here?

"A No. We get these certificates from doctors in many, many cases.

"Q Well, actually, is this certificate from a doctor?

"A It is on his letterhead. It shows dictated by HGK, which * * [are] his initials, and OP as his secretary.

"Q  Who signed that?

"A  OP, his secretary.

"Q  That is not the doctor's signature, is it?

"A  She probably had authority to sign.

"Q  I didn't ask you that, sir.

"The Court: Well, I don't think that is a fair proposition.

"Mr. Berger: Well, it shows that it is not.

"The Court: It is taken from the record, obviously taken from the record, see, so you go from there. It is one of the business records. You understand the statute on that subject.

"Mr. Berger: I understand the statute, but the statute does not apply in all instances to this particular situation. This was written by a secretary and not by a doctor. The doctor is available—

"The Court: Now, just a moment. Don't make a speech. Don't make a speech now. He is available to you too.

"Mr. Berger: Your Honor—

"The Court: You made your objection on the record and the objection is overruled.

"Mr. Berger: I object to the use of this letter. The letter was not signed by the doctor, and it is obviously signed by the doctor's secretary. The doctor being available in the city, we object to this as hearsay even though it is part of the record.

"The Court: And the doctor is available to you. The rule is very clear that the court is using—that is, the business records rule—and for the benefit of the jury, I want to read that statute, because Mr. Berger disagrees with it."

The court then proceeded to read the statute to the jury. There was no reason in law why the court should have done this. The issue of the letter's admissibility was not one for the finders of fact, but solely one for the court. Cromling's counsel insists that the reading was done by the court for the purpose of humiliating him by demonstrating his supposed ignorance of the law. The reading of the statute under the circumstances could have had that effect for the court said it desired to read the statute "because Mr. Berger disagrees with it." The fact that the court itself was in error in applying the principle of the statute as it did is presently beside the point. Assuming as we do that the court had no intention of disparaging counsel, nonetheless we cannot avoid the conclusion that, under the circumstances, the reading of the statute could have had a belittling effect on Cromling's counsel and therefore, on Cromling's case. We conclude that the court's action was prejudicial.

Other incidents occurred which need not be detailed here but two of them do, we think, require mention. The first of these arose when Cromling's counsel attempted to interpose an objection in respect to a report made by Dr. Gadd. The objection was an entirely proper one. The court said: "Will you sit down a moment? I have ruled on this matter." The other incident took place near the end of the trial when Cromling's counsel objected to the formal admission of a hospital record. The objection was one which counsel was entitled to make. The court said: "Oh, you have objected to half a dozen things. Don't worry about this one." The latter remark of the court implies a disparagement of Cromling's counsel. Such a remark must be deemed to be hurtful and, therefore, prejudicial.

■■■■■  It is axiomatic that the function of a trial judge in a federal court is much more than that of a mere arbitrator to rule upon objections and to instruct the jury. "It is his function to conduct the trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties." Knapp v. Kinsey, 232 F.2d 458, 466 (6 Cir.), cert. de-

nied, 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956). To this end it has been stated that "[i]t is his duty to see that the issues are not obscured and that the testimony is not misunderstood." Ibid. Among his specific obligations in this regard, is a duty to admonish counsel when necessary for this purpose. But the admonishment should be effected by the use of temperate language. See John E. Smith's Co. v. Lattimer Foundry & Mach. Co., 19 F.R.D. 379 (M.D.Pa.), aff'd, 239 F.2d 815 (3 Cir. 1956). The trial court must at all times strive "for that atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." Glasser v. United States, 315 U.S. 60, 82, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942).

■ We can perceive no legal justification for any of the verbal acts of the trial judge directed to Cromling's counsel set out in this opinion. The cited statements are not justifiable as bearing any substantial relation either to the issues presented by the trial or to any improper conduct of counsel. Moreover, some of them, at least, were harmful to the plaintiff's case. Considered as a whole, they appear to fall into an undesirable pattern which might have had the effect of causing the jury to consider the plaintiff's case other than on the merits. As we said in the opinion in Sleek v. J. C. Penney Co., 324 F.2d 467 (3 Cir. 1963), a trial judge should be guarded in his comments. Viewing the sum of the verbal acts of the trial judge directed to Cromling's case and to his counsel, we are compelled to conclude that on this phase of the case there also was prejudicial error.

■ Rule 59(a), Fed.R.Civ.Proc., 28 U.S.C., provides that a new trial may be granted on all or some of the issues presented by a case. Here the interests of justice will be best served by restricting the new trial solely to the issue of damages. The judgment will be reversed to the extent indicated and a new trial will be ordered limited to the issue of damages.

On Petition for Rehearing and Answer

Before BIGGS, Chief Judge, and McLAUGHLIN, KALODNER, STALEY, HASTIE, FORMAN, GANEY and SMITH, Circuit Judges.

PER CURIAM:

For the reasons stated in our opinion filed herein on November 13, 1963, we ordered a new trial to be restricted solely to the issue of damages. See Rule 59(a), Fed.R.Civ.Proc., 28 U.S.C. The appellee, The Pittsburgh and Lake Erie Railroad Company, filed a petition for rehearing and the appellant has filed an answer thereto. It is now apparent that the parties are in doubt as to how they are to proceed in the court below. The case arose under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Section 53, 45 U.S.C.A. provides in pertinent part: "[T]he fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee * * *."

Cromling, the appellant, takes the position that broadening the issue of damages to include the effect of contributory negligence will open the second trial generally and that he will be obliged to offer evidence on negligence which could result in a judgment in favor of the appellee Railroad. But, at the new trial, pursuant to our ruling, the negligence of the appellee must be regarded as adjudicated, and hence cannot be an issue. It follows that Cromling's apprehension of having to prove the Railroad's negligence is unfounded.

Cromling insists further that the Railroad's negligence would have to be considered because of the comparative negligence theory of an FELA action. The comparison, however, is limited to the *amount of damages,* for the statute provides that "the *damages* shall be diminished by the jury in proportion to the amount of *negligence attributable to*

*such employee."* (Emphasis supplied.) See the statute as cited *supra.*

Proof of contributory negligence, of course, will be the burden of the Railroad. Cromling may meet it with any admissible evidence including, perhaps, testimony of the Railroad's negligence. Such evidence, if any, will be introduced, however, not to prove that the Railroad was negligent, but to prove that the claim of contributory negligence is hollow and without substantial weight.

Cromling asserts that there was no probative evidence of contributory negligence in the case but concedes that the court charged the jury to determine whether or not there was any. Cromling's counsel did make an objection to the charge on the issue of contributory negligence but pointed out that the burden of proof should be put upon the Railroad on this issue. He said: "If your Honor please, I would like to suggest to your Honor to charge on the burden of proof on contributory negligence. It is on the defendant [the Railroad]." The court replied: "Yes, the burden in contributory negligence is on the part of the defendant. There is no question as to that. The defendant has the burden of proof." Cromling now contends that there was insufficient evidence to go to the jury on this issue. There was some, however, even if it was elicited only on cross-examination as Cromling presently contends. If the Railroad presents no more evidence in the second trial than Cromling says that it did at the first, the question of whether the issue of contributory negligence shall be sent to the jury will remain of course one for the trial judge. As to the sufficiency of that evidence when and if it is presented we cannot and do not now express an opinion. If Cromling should deem that evidence to be insufficient, there are appropriate means available to him to compel the withdrawal of the issue of contributory negligence from the jury.

The points raised by the petition for rehearing and the answer require no further discussion. Rehearing will be denied. The court below, upon remand, will proceed to ascertain damages in accordance with our opinions, as the facts and law shall require. No modification of our original judgment is required and accordingly none will be made.

Judge McLAUGHLIN and Judge GANEY record themselves as in favor of a rehearing on the ground that the court erred in one of its reasons for reversal, namely, because of the conduct of the trial judge.